IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION



FILED
JUL 0 7 2023
Clerk, U.S. District Court
Eastern District of Texas

| | |
|---|---|
| FRANCIS PALARDY,<br><br>    Plaintiff,<br><br>v.<br><br>AT&T SERVICES, INC., INTERNATIONAL BUSINESS MACHINES CORPORATION, EXPERIS US, INC.<br><br>    Defendants. | CASE NO. 4:21-cv-00626-SDJ-CAN |

## MOTION FOR SANCTIONS

Plaintiff Francis Palardy files this Motion for Sanctions on Defendants AT&T SERVICES, INC. and INTERNATIONAL BUSINESS MACHINES CORPORATION pursuant to Rule 11 ((b) (3), (4)) Federal Rules of Civil Procedure. Defendants did not provide evidence needed for their main arguments in both Defendants Motion For Summary Judgment (Dkt 79) (Dkt 80), and their Response to Plaintiff's Motion For Summary Judgment (Dkt 76).

### ARGUMENT

Plaintiff was never satisfied with Defendants disclosures, particularly related to security. By security Plaintiff means authorization that companies grant to use various software and computer services. Security is an issue that companies do not like to disclose, making it difficult to prove they are withholding evidence. Only recently Plaintiff realized that AT&T and IBM largely invented security authorization methods. Since they invented this area Defendants methods are known. Defendants failed to provide evidence they authorized access even as they repeatedly claim Plaintiff had access.

Defendants IBM and AT&T filed nearly identical Motions for Summary Judgment. There are slight differences between their Motions but both have the same issue with evidence.

Defendants AT&T and IBM Response to Plaintiff's Motion for Summary Judgment (Dkt 76) is nearly identical to their own Summary Motions, again without evidence in support. Defendants violate Rule 11 (b)(3) and 11 (b)(4). They have not provided evidence to support their claims Plaintiff had authorization for access, and they denied Plaintiff's claim that he did not have access without evidence. Defendants strategy is to refuse to cooperate and run out time. This qualifies for sanctions.

1.      Access Control List

In their responses to Plaintiff's federal requests for production the Defendants repeatedly claimed that Plaintiff was given the "same intranet access his team" in each question regarding computer access. Throughout their Motions and Responses the Defendants insist Plaintiff had access (Dkt 79, p 22, ¶2)(Dkt 79, p 7, ¶ 35)(Dkt 80, p 7, ¶ 39) but Defendants have provided no evidence that Plaintiff had the same access as the rest of the team, or any access at all other than for email and to log into the laptop (but not change it). Evidence of Plaintiff security access should exist and Defendants control that.

Defendants essentially claim that access on a corporate network running a Unix based operating system is the same as Microsoft Windows. They know this is not true. Defendant AT&T invented Unix and IBM produces the most popular version of Unix. Access on a Unix based system is not open. Everything needs approval and this is done by the computer based on stored information. Plaintiff claims Defendants withhold the authorization access evidence because it proves Plaintiff did not have authorization for access. Defendants claim Plaintiff had access without providing this evidence.

Plaintiff brought up the issue of computer authorization access in multiple pleadings and more than one hearing before the court. The government has not established a legal framework in

terms of documenting how companies maintain computer security or the vocabulary around the issue because companies like to keep it secret. For the benefit of the public and national security this needs to be more open.

AT&T invented the basic components of computer security in 1971. This included the username, password, chmod, and the access control list (ACL). AT&T was a monopoly and required to share its technology so its methods were copied by everyone and are still used in corporate environments throughout the world. Since AT&T did invent this security it is certain they use it. The ACL is literally a list of all programs and computer services a user is authorized access to. This list shows what Plaintiff was able to access in Defendants networks.

2.   Network Access

Defendants pleadings create the impression AT&T's network is just like a Windows home network, and Plaintiff's difficulty with that proves incompetence. There is no reference there because they don't actually say that, but imply such without evidence. A large corporate network, especially AT&T, is nothing like a home network. AT&T's network includes the largest cellular and the largest cable systems in America. Microsoft Windows users typically are "root", which means they have all access. Root access is tightly controlled in Unix, which AT&T invented.

Defendants did provide evidence that they issued Plaintiff a username and password, which AT&T manager Martin McEnroe emailed to a third person. (Plaintiff kept the printout McEnroe gave him with that information.) It would be a security violation to email a password to another person, but Defendants have denied there were any security faults on the part of McEnroe. There is an explanation for that, a username only provides the most basic access.

A user is not authorized access to programs or services until the access is approved by the manager. Initially, when Plaintiff's username was created it would have nothing listed in the ACL. Normally, someone on the team is assigned to add basic items to the ACL for the new person. McEnroe would receive notice and approve the access. When you request and are granted security access this triggers emails to both Plaintiff and several other people, not unlike the Court system.

The last and only time he spoke to McEnroe the Plaintiff stated he needed access. McEnroe only mentions Plaintiff's network access in that he had it terminated (Dkt 76, 79, 80, Exhibit A-2 at 4, ¶ 15). In disclosure Defendants also included forms for locking Plaintiff out of the building. McEnroe's statement never claims that everyone had the same level of authentication access. He pretends the issue does not exist, but Defendants claim in their motions that the team all had the same access. They provided no evidence of that.

In April the magazine Fortune focused on the issue of contractor access in an article (April 7, 2023) "Penned tech specialists are earning six-figures salaries to do nothing." (https://fortune.com/2023/04/07/tech-bank-jobs-paid-to-do-no-work/) Fortune was owned by Time Warner for decades until just before Defendant AT&T bought that company. One paragraph from the Fortune article includes a quote from a "top ten bank". (No one wants to be quoted regarding security issues.)

> "A lot of it is down to processes- we often have difficulty getting them access to the right level for them to be able to work. That can take weeks, you can have somebody start and they don't even have access to the system. They literally just have to sit there – there are lots of software developers who come in and they're ready to start, they try to log in to their laptop and they don't have access to anything. They spend days on the phone with the help desk. This happens to I'd say seven out of ten of the software engineers I see onboarded."

AT&T and IBM today are not the same company as 1971. Bell Labs spun off. The Foundry facilities where Plaintiff worked were similar to Bell Labs, but not the same. Bell Labs hired people at the top of their fields, while the Foundry was full of contractors. Still, AT&T invested a large amount in the Foundry. Something like 5000 engineers worked at the two locations in Plano alone. That is about a billion dollars a year, or $10 billion over a decade. AT&T invested so much in research and development because they expected some of it would pay off. Chat-bots have certainly done well, but they did not know which area would pay off. Authentication of access needed to be secured and evidence of such is maintained.

Defendants pretend to know little about security. AT&T is not the company it was fifty years ago, but AT&T bought a company called Alienvault for $600 million in July 2018. (cybersecurity.att.com/who-we-are/press-releases/at-t-to-acquire-alientvault) That was a half-year before Plaintiff worked at the AT&T Foundry. The name of Alienvault was changed to AT&T Cybersecurity. AT&T announced intentions to provide authorization security for small and medium sized companies. IBM also sells expertise in this area. For Defendants to make claims about Plaintiff's access without providing evidence violates rules of evidence, and they clearly have expertise in this area.

3.   Passwords

Defendants Summary Motions claim that "Plaintiff acknowledges that it took him more than an hour to figure out how to log in to the computer with the password that was provided to him." (Dkt 79 at 6, ¶ 32) (Dkt 80 at 7, ¶ 36) Also, "it took him more than an hour and the assistance of another employee just to log on to the computer." (Dkt 79 at 18: ¶ 1) (Dkt 80 at 17: ¶ 1). Defendants rely on Plaintiff's deposition as evidence of that but this is not at all what

Plaintiff stated. The password simply did not work. Another employee was able to log in, but it's not clear how or if he was just a guest.

A ten digit password of letters, numbers and limited symbols has 50 to the 10th possibilities. This is roughly 100,000,000,000,000,000 options. A computer trying a million options a second could take a week (on average) to crack it. It might be possible to produce passwords that quickly but a Windows 7 laptop wouldn't be able to process more than a few each second. McEnroe's laptop could take 10,000 years to crack the password. This was actually (one of) the network passwords, not for the laptop itself.

McEnroe's declaration doesn't claim Plaintiff should have cracked the password, but (possibly) questions why Plaintiff did not reset the password sooner. McEnroe was not there. There is some truth that Plaintiff had more difficulty resetting the password because it involved talking on the phone and hearing a random password. It is not normal for a contractor to need to reset their password right away. That Plaintiff reset the password does not provide evidence he was provided access needed to do his job. Defendants are misusing evidence of the password to claim it proves incompetence when the password demonstrates nothing. It is evidence that McEnroe made emotional attacks on Plaintiff that followed no logic, but assumed others would believe him because he supposedly knows tech. In recent years non-tech people know more about tech, but inner workings of large networks are hidden. Without knowing the details the Court should be able to determine these networks are not wide open like a Windows laptop from twenty years ago.

4.  Laptops

McEnroe's email requesting Plaintiff's dismissal claims that Plaintiff had two laptops so he had no excuse not to get them working. Having multiple laptops is of no more use to a

programmer that it is to a lawyer. Plaintiff did use these laptops, but without authorized access he could not do any work. McEnroe admits in his MLK email that the Mac Pro loaned to Plaintiff needed to be set up (Dkt 79, 80, Decl of McEnroe, Exhibit D, at 1, ¶ 2). The Mac laptop was nearly new, so it had standard Apple software. Defendants describe it as "full access". (Dkt 79, at 20, ¶2) That is not what McEnroe stated. This access is separate from access to the network. In Unix based systems all access is separate. There is no universal access other than for the "root" account. Root is highly restricted, such that at AT&T it is probably limited to a special room underground with armed guards. The NSA probably has a connection to that room. This is different than Windows which is typically set up so the user is root.

Part of access control is that execution is highly restricted. Installing most programs is considered execution. For execution you typically need sudo access. (Some programs have execution but not write access so that you can't change it.) Making any change to the access control list requires Super User status (sudo or administrative). If you have sudo access you can grant yourself privileges.

Windows, Macs and even smartphones allow you to quickly create a guest user. With Microsoft the new user is automatically made "standard". In Apple it is a 'guest". A guest does not have sudo access, so they can't make changes or install programs. Defendants admit both laptops were "loaned". It would be a major risk to give sudo access to a laptop you loan to someone else. Defendants have not provided any evidence that these loaned laptops had administrative access, even as they claim that Plaintiff did have access. Their claim of access seems based on Plaintiff's Deposition, but that does not support their claim.

Plaintiff's was asked in the Deposition if he wrote, "He (McEnroe) tried to get me a laptop with access. He tried to get me administrative privilege." (Dkt 79, 80, Exhibit A-1,

Palardy Dep. at 186:14-18). Defendant (Dkt 79, p 22, ¶2) refer back to this question but make it sound like McEnroe got Plaintiff admin access. At one time Plaintiff believed that McEnroe forwarded an email requesting admin access, but Plaintiff was dismissed before being given this access. Defendants are using a reference to an email they did not provide as evidence for their argument. If the actual email were made available it would prove Plaintiff still did not have sudo access on his last day.

Elsewhere in their Motions Defendants directly state that Plaintiff's loaned laptop had admin access, but they do not state where evidence comes from (Dkt 79, p 7, ¶ 35) (Dkt 80, p 7, ¶ 39). Defendants claim being able to access a forum means Plaintiff had all the access he needed. Every service requires access and the laptop needed its own access. The forum only required authorization from the team manager that controlled the forum. Other services required McEnroe's approval along with possibly another team manager. McEnroe should have approved Plaintiff having admin access for the laptop, but McEnroe never even claimed that he did. Rather he pretends that security is nonexistent, assuming nontechnical people would not see that this is obviously wrong. McEnroe and Defendants should not have any trouble understanding standard Unix authentication given that AT&T invented it. Macs are based on Unix.

In his sworn Declaration to the Court McEnroe plainly lies by stating that the Windows 7 laptop Plaintiff borrowed was "his" as in Plaintiff's. (Dkt 79, 80, Exhibit A-2, Declaration of McEnroe, ¶ 9) Defendants admitted the Windows laptop was loaned and it was McEnroe's. (Dkt. 79 at 6, ¶ 30) (Dkt. 80 at 6, ¶ 34) So of course when McEnroe logged in his own laptop his name was there. That McEnroe would be surprised is "theater". (AT&T reminds Plaintiff of the Van Damme movie Cyborg.) Plaintiff brought his own laptop but was not allowed to use it per AT&T security rules. Defendants refuse to provide actual evidence and instead make things up.

5. The List of Tasks

The "list of tasks" is an important piece of evidence that the Defendants rely on in their arguments but they have not provided. McEnroe never mentioned the list but Defendants at some point added it in. It is typical for new employees to get an email with some list of information and possibly basic tasks to complete, but Plaintiff never stated such a list exists. Defendants never said what was on that list, not even one item. They never said who gave Plaintiff this list. Defendant refers to this "list of tasks" without providing the list. (Dkt 79, at 20, ¶ 2).

In their Motion the Defendant references Plaintiff's Deposition as evidence of the list (Palardy Dep at 145:8-11), but Plaintiff never said he was given a list. The question was not even about the list. This is a tactic Defendant repeatedly uses, referencing the Deposition when it does not support the argument. This is claim of evidence where it does not exist is another failure to provide evidence. Plaintiff claims evidence such as the list is needed in order for this Court to rule on pending Motions.

6. Jira

Defendants reference a computer program called Jira to claim Plaintiff demonstrated incompetence (Dkt 79, 80 Decl of McEnroe, Exhibit D at 2, ¶ 1). Defendants do not specify Jira in their Motion but refer to tasks on the "dashboard", which would be Jira (Dkt 79 at 20, ¶ 3). Jira is software similar to Pacer. All business software requires authorization through something like a username and password. A smaller company might require usernames and passwords for each application. Most large companies use an SSO (single sign on) program. AT&T has promoted their own SSO program, including for cell phones. The SSO signs employees into applications, so you don't need usernames and passwords for every service or website. The SSO relies on the ACL or something similar.

It is not possible to access Jira without a password. Plaintiff double checked this on the internet. There is a discussion board over this issue because it was possible to access Jira without a password in 2003. This was a new company (Atlassian) and they wanted to make it easy for users to get started. (Atlassian is now worth more than either Defendant.) After complaints about no password being needed they required a password. Basically all business software requires a password. Defendants have provided no evidence that Plaintiff was provided credentials for Jira or authorized for access to Jira, or any other software.

Defendants have provided notice (Dkt. 77) that they do not have any emails for Plaintiff. Even if that is true an email with this list is with whoever sent it. If McEnroe sent the email it would be in his account. If someone else at AT&T sent such a list they would have the email. It's easy to search through email and find everything with Plaintiff's name. Defendants have not provided any email sent to Plaintiff by AT&T.

7. Plaintiff Completed No Work

Defendants claim that Plaintiff did not complete any work during the time he was at AT&T. When you consider the previous issues, particularly access, it is clear that Defendants have not provided evidence that Plaintiff could do any work. Again Defendants rely on Plaintiff's Deposition as evidence that he did not complete a task. Reading the Deposition it should be clear that Defendants define tasks differently than Plaintiff. Plaintiff was trying to set up a laptop for access and was unable to do that. That was the task. Sometimes tasks can not be completed because of outside forces. The job of the Scrum Master is to help with issues blocking a task, but Plaintiff was dismissed before this could be resolved.

Jira is based on a schedule called Agile Scrum. The rules of Scrum are well known and similar to the Court. It runs on a two or three week rotation. Agile does not expect you to

complete anything in a few days. The contract between AT&T and IBM also allowed for three weeks (Dkt 70, Exhibit 23).

In the Deposition the Defendant counsel asks multiple questions about why Plaintiff did not request more information from the Scrum Master. Defendant claims this as evidence Plaintiff did not do his job (Dkt 79 at 21, ¶ 1). The reference to Plaintiff's Deposition pages 149-150 involve a Scrum Master on the speaker remotely that Defendants have refused to name. Defendants repeatedly reference this unnamed woman as evidence Plaintiff did not ask for any work (Dkt 79 at 8, ¶ 46) (Dkt 80 at 8, ¶ 50). Katy Hodges was not the Scrum Master and not remote. McEnroe was not the Scrum Master.

A Scrum stand-up is similar to a court briefing, but even shorter. There were ten people on the team and the meeting was a half hour. Each person gets a chance to speak, similar to several court cases during the same time slot. Plaintiff could have asked what he was expected to do, but there would not be enough time to give an answer. As Plaintiff stated in the Deposition there was concern about him not having access, which he needed before he could do anything else.

Not only did Plaintiff not have access to the Jira, but Plaintiff would first need to know that AT&T was even using Jira. There are many types of software to keep track of Scrum. Jira is hosted on the internet, so an html link could show the location for the team dashboard. Defendants referred to the "list of tasks". Presumably the Jira link would be in that list, but Defendants have never provided this important piece of evidence.

8. Education and Experience

Even as Defendants refuse to provide evidence for their own arguments they insists that Plaintiff providing proof of his education, experience and credentials is not evidence of his

ability. The requirements for the job were a certain amount of education, experience and credentials. Defendants have not provided any evidence that Plaintiff's resume was inaccurate. Instead, they rely on implied bigotry that Plaintiff's background can't be valid, all the while claiming there is no discrimination. In this case the lack of evidence also demonstrates discrimination.

9. Deaf Mutes

McEnroe's email to IBM on MLK day in 2019 made several outlandish claims (Dkt 79, 80, Decl of McEnroe, Exhibit D). His sworn declarations included with both Defendants Motion Summary Judgments (Dkt 79, Dkt 80, Exhibits A-2 and A-4) were also included with the Response to Plaintiff's Motion for Summary Judgment. (Dkt 76, Exhibits A-2 and A-3) McEnroe's first declaration includes only a few of his original MLK claims made to IBM (Dkt 79,80, Exhibit A-2). McEnroe's supplementary declaration includes none of the MLK claims (Dkt 79,80, Exhibit A-4). This demonstrates Defendants can not support the claims in the MLK email. Those wild claims of extreme incompetence are bigoted on their face (Prima Facie).

Defendants anticipated McEnroe's first declaration (Dkt 79, 80, Exhibit A-2) could be found useless. This explains why McEnroe submitted a supplemental sworn declaration (Dkt 79, 80, Exhibit A-4). If McEnroe's statements are not truthful and this is the only evidence provided by Defendants than how can the Court rule in favor of Defendant's Motions?

McEnroe's second declaration only covers if he was aware if Plaintiff needed accommodations. The claim that he was not aware contradicts McEnroe's first declaration where he claimed (Dkt 79, 80, Exhibit A-2, ¶ 24) that he knows all about implants and does not need an explanation. This is what he said in person, making it difficult for Plaintiff to ask for accommodations, especially after McEnroe referred to "deaf mutes".

Defendants have claimed that Plaintiff did not provide evidence for his Summary Motion. Plaintiff does not need much evidence. He is only proving that Defendants engaged in discrimination. This is obvious when McEnroe referred to "deaf mutes" in his own writing. Defendant counsel grilled Plaintiff on this issue in his deposition. Counsel used the term "deaf mute" more than 16 times, accusing Plaintiff of obfuscating. It is right there in McEnroe's MLK email (Dkt 79, 80, Decl of McEnroe, Exhibit D, at 2, ¶1). Defendants believe they can bully reality. They control CNN!

What McEnroe said to Plaintiff in person was similar to his MLK email. The difference was in person he said a deaf person can't do this job. Like the MLK email McEnroe did not directly call Plaintiff a deaf mute, but talking about deaf mutes to someone with a hearing loss shortly before you terminate them is clearly discrimination. The evidence is clear on this issue of the use of deaf mutes. Defendants attempts to claim otherwise is lying.

10. Tech Forums

Defendants repeatedly conflate normal workplace issues with Plaintiff being incompetent. Why would AT&T have tech forums if they did not want employees to "waste time" on them? Plaintiff found in IBM's standard on-boarding material, that he never received but is available on the internet, where IBM encourages contractors to make use of internal forums.

Every large company has chat forums now. One of the most popular employee chat services is Slack, recently bought by Salesforce. At lunch others on his team told Plaintiff they often used these chats forums. Since Plaintiff has a hearing loss he might prefer to use written chats more than in person chats. Making that into a reason to terminate is discriminatory. Indeed, all the issues Defendants claim as a basis to terminate Plaintiff relate to hearing in some way.

McEnroe's declaration claims that he knew Plaintiff had network access based on his signing up for the tech forums (Dkt 79 at 7, ¶ 42) (Dkt 80 at 8, ¶ 46). That is not evidence. Plaintiff was able to sign up for forums because they did not require McEnroe's approval. The forums approved access overnight, but Plaintiff never used the chats because McEnroe unsubscribed them. By his own MLK account McEnroe admitted unsubscribing Plaintiff from these chats was not normal, but he justifies it because he knew Plaintiff was too stupid to understand what was happening (Dkt 79, 80, Decl of McEnroe, Exhibit D, at 1, ¶ 6). That he made this assumption right after meeting Plaintiff is on the face bigotry. To claim otherwise is redefining what discrimination is and denying the law itself.

11. Employment Issue

Defendants Motions regarding the employer issue rely almost entirely on Plaintiff's Deposition, but the references to the Deposition does not support what Defendants claim. Nearly every number of the "undisputed facts" are not in agreement with what Plaintiff said (Dkt 79, at 3-6, ¶ 1-49) (Dkt 80, at 3-8, ¶ 1-53). A Summary Motion requires a lack of disputed facts. Of the first 49 points only the most basic facts are correct. Nearly every other claim is not agreed to by the Plaintiff and Defendants provide no other evidence other Plaintiff's Deposition.

As an example, in multiple places Defendants claim Plaintiff "made no effort to perform any work", or "pick up work assignments". When you check the reference in Plaintiff's Deposition on page 114 he actually stated "I don't remember". (Dkt 79, 80, at 6, ¶ 25) (Dkt 79,80 at 20, ¶ 2). Defendant counsel asked Plaintiff what he did one day at a specific hour four years earlier and he could not recall. Further, Defendants knew Plaintiff needs to make an effort to hear. He was provided captions, but that takes a moment and Defendants counsel repeatedly interrupted him.

Defendants have repeatedly claimed that Experis did not terminate him when they actually sent an email stating he was terminated. The supposed evidence Defendants use for reference is Plaintiff's Deposition (Dkt 79, 80 at 19, ¶ 1) (Dkt 79, 80 at 9, ¶ 57). These both reference page 249 in Plaintiff's Deposition, but that does not agree with their claim. The Deposition does not mention termination.

Defendants counsel did ask if Experis continued to send emails with lists of jobs. Experis did continue sending Plaintiff spam type emails, and they still send spam lists of possible jobs on a weekly basis. They have a computer program that matches individuals skills with job skills and it sends out emails. So do other recruiters. Such programs go back to the 1990s. The Court has already ruled Experis was not the employer. Defendants make contradictory claims regarding who was the employer without providing evidence.

Both of Defendants Motions run through a series of facts from Plaintiff's Deposition regarding Experis (Dkt 79, at 13) (Dkt 80, at 12). Most of the claims are not agreed to or supported by the Deposition. Defendants misuse of the Deposition as a record should make the Court weary of relying on Plaintiff's Deposition for evidence at all. Defendants claim Experis handled everything regarding hiring, but that is not what Plaintiff stated. The Employment issue is debatable, while their misusing Plaintiff's words and claiming that as evidence is not.

The Court tends to grant employers the right to hire and fire employees based on their own reasons, but there are employment laws. These laws are all the more important to a major company like AT&T, which has extremely close ties to the government. For several decades AT&T was administered by a federal judge. Just last week AT&T received billions of dollars from the government through broadband programs (that go back years). Various federal programs like Covid PPP paid AT&T employees directly. Plaintiff sued under the Rehabilitation

Act and neither Defendants contested this. The Rehabilitation Act requires Defendants to be recipients of federal monies. When Plaintiff first spoke with Defendant counsel he said they had unlimited amounts of money for this lawsuit. The Court should not grant Defendants special privilege to not provide evidence.

12.     Defendants Claims of Threats

Defendants did provide hundreds of pages of disclosure. Much of it is internal documents from the EEOC that the federal government was not supposed to supply. The EEOC agent even complains how difficult it was to access the information and make copies of it. The internal documents show the EEOC largely believed Defendants, but only after the original agent became disabled himself. He was featured in a multi-part story on the front page of USA Today regarding corruption within the EEOC in Dallas.

The only part of Defendant's Motions where they provide their own evidence is on page 10 where they focus on the supposed threats. Of the actual disclosure there are dozens of pages of reports requested by McEnroe regarding so-called threats made by Plaintiff. This is not relevant to this suit and it does not even support Defendants claim that Plaintiff made threats.

Defendants told the EEOC multiple police agencies were involved, which is one reason they did not pursue the claim. The police reports from Plano and Richardson state that no threats were made. The reports were only completed at McEnroe's insistence. The fact that McEnroe was able to produce so much documentation regarding "threats" contradicts Defendants inability to find any evidence that Plaintiff had security access, a "list of tasks" or other important evidence related to the suit.

Plaintiff previously worked at MGM, which had similar issues to AT&T. These corporate problems were common in the 1990s as a result of corporate pensions and Michael Milken.

MGM was largely given to Warner in a deal put together by Michael Milken. AT&T is also made up of pieces of companies put together by Milken. AT&T Wireless was McCaw Cellular, which depended on Milken finance. AT&T Broadband comes from Tele-Communications Inc. (TCI), which was also financed by Milken. Milken was convicted of racketeering based on these deals. Milken was convicted of hiding his involvement in controlling trading of their stocks.

In 1998 Milken agree to pay the Court $47 million for fees he received related to advising MCI, a rival of AT&T. There were also $50 million in fees related to Time Warner and Turner, which involved MGM, that the Court let Milken keep. Given his involvement with Warner it is likely AT&T bought the company because Milken still has influence. Racketeering always has an element of violence to it.

## Sanctions

Sanctions in such situations are limited largely to cost of time wasted. Plaintiff is not a lawyer but his time can easily be calculated. He was hired at $1 a minute (120k a year) shortly after filing this suit. 1 million minutes passed since he filed the suit. (Plaintiff plans his time by the minute.) Plaintiff did not start his current position right away and was able to complete motions for his Softworld suit before he started his job, so that did not take much of his time. That suit was settled a year ago.

Plaintiff spent 10 percent of his time on this suit, or $110,000. (His wage went up 10% in the last year.) The time he wasted was worth more than that because it prevented Plaintiff from studying AI such that he could earn more money. The time wasted is more than what Plaintiff asked to settle, which was six months pay. Plaintiff does not wish to settle now, but he should be compensated for wasted time as the law allows.

Dated: July 7, 2023

Francis Palardy
Pro Se
6990 Windhaven Pkwy. #316
The Colony, TX 75056

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of this document was served upon Defendants AT&T and IBM counsel of record and counsel of record for Defendant Experis US, Inc. via email in accordance with Federal Rule of Civil Procedure 37 on July 7, 2023.

Francis Palardy
Pro Se
6990 Windhaven Pkwy. #316
The Colony, TX 75056